1
2
3
4                          UNITED STATES DISTRICT COURT
5                         NORTHERN DISTRICT OF CALIFORNIA
6
7      WILLIE WILLIAMS,                          Case No.  14-cv-00101-EMC
8                      Plaintiff,
                                                 **ORDER DENYING PETITION FOR**
9              v.                                **WRIT OF HABEAS CORPUS**
10     KAMALA HARRIS, et al.,
11                     Defendants.
12
13
14                    **I.      INTRODUCTION**
15         Willie Williams, a prisoner currently incarcerated at the California State Prison Solano,
16  filed this *pro se* action for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Respondent has
17  filed an answer and Mr. Williams has filed a traverse.  Mr. Williams' petition is now before the
18  Court for review on the merits.  For the reasons discussed below, the petition for writ of habeas
19  corpus will be denied.
20                    **II.      BACKGROUND**
21         Mr. Williams and codefendant Sheridan Smith were charged in Alameda County Superior
22  Court with robbery special circumstance first-degree murder.  3CT at 644-50.  Smith was
23  separately charged with forcible rape.  *Id*. at 645.
24         The California Court of Appeal summarized the trial testimony as follows:

> A. Prosecution Case
> The murder and rape occurred on the morning of May 28, 2005, at a
> homeless encampment in Oakland on land known as the "jungle," a
> fenced-in parcel of heavy brush and tall grass under the 980 freeway
> bordered by Northgate, Sycamore, and BART tracks.  A trail from a
> hole in the fence on Northgate led uphill to mattresses where 39–
> year–old Vincent, 33–year–old Ana, 54–year–old Wanda, and 36–

year–old Zeke were sleeping.  Vincent was Ana's boyfriend.  Ana had known Wanda for many years and called her "Auntie."  Vincent was a crack user; Ana, Wanda, and Zeke were heroin addicts.

Ana and Zeke awoke and saw defendants, together with a third man who was never identified, standing at the foot of the mattress they shared with Vincent.  Ana had seen Williams, who was known as "Razor," and the third man in the neighborhood, but did not recognize Smith.  Wanda, who had been sleeping on a nearby mattress, also recognized Williams.  Zeke had never seen the men before.

The three men were passing around a bottle of alcohol, and appeared to Wanda to be intoxicated.  At trial, Ana testified that the men looked like they had been up all night, but did not appear drunk or stoned.  But in her interview with the police, Ana said "all seemed really spaced out," and she testified at the preliminary hearing that they appeared to be drunk and stoned on crack cocaine, "[a] bad combination."  Smith was holding a cane sword: a four-foot-long walking cane that came apart to reveal a two-foot-long blade.

Ana testified that she asked the men what they wanted and told them to go away.  Smith pointed the sword at her and asked Williams, "[W]ant me to shank this bitch?  Want me to stab this bitch right now?"  Williams did not respond, and Ana falsely claimed to be pregnant to try to gain their sympathy.  Wanda testified that she awoke around 7:30 or 8:00 that morning when she heard Ana screaming "they gonna kill me, they're gonna hurt him, or something like that."

When she opened her eyes Wanda saw defendants, and later observed the third man, down the hill on the trail.  Zeke said the third man "just kind of stood off in a distance," "looking in our direction and away."  Wanda said that he "stood down the hill most of the time, like he was watching the trail."

Ana testified that Vincent asked what the men wanted, and Williams asked Ana, Vincent, Wanda, and Zeke if they had any money.  Speaking gruffly like Williams, Smith said "yes, give him some money."  Zeke gave Williams $10, and Smith pointed his sword at Ana and Vincent.  Ana had $30 in her shoe that she had earned from prostituting the night before, but Vincent indicated that she should not to reach for the money.

Zeke recalled giving the money to Smith, and testified that Smith said they were looking for Vincent about "[s]omething pertaining to money owed or some sort of disrespect."  The amount they claimed that Vincent owed kept increasing, from $30 to $15,000 or $20,000.  Zeke gave Smith all the money he had in his pocket because defendants were armed and they were in an isolated area.  It was a "scary" situation and he did not want to be beaten up.  When Smith took the money he told Zeke, "Okay.  This will get you a pass."

Ana testified that Williams began to accuse Vincent of being involved with his woman.  Williams said that Vincent had been at

2

United States District Court
Northern District of California

his house when he called home from jail.  He heard Vincent laughing during the call.  Wanda testified that Williams "was saying something about he had called home and Vincent had answered the phone, and he was walking around with his shirt off.  I don't know, I guess bragging or something. . . .  [T]o me, it didn't make any sense."  Williams accused Vincent of "stopping [Williams'] money and something when he was in jail," and having driven his car.  Ana testified that when she and Vincent denied that Vincent had a relationship with Williams' woman, Smith said, "Are you calling my man a lie?"

According to Ana and Wanda, defendants then started talking about the Black Guerrilla Family prison gang.  Wanda testified that defendants told Vincent that he knew what he had done, that he was hiding out, and that they had taken up a B.G.F. contract and "were supposed to take us all out."  To Wanda, "that didn't make any sense either," because she knew Vincent was not affiliated with the B.G.F.  Williams told Vincent that he had put defendants "in a messed up position."  Ana testified that she and Vincent denied that Vincent was the target of a B.G.F. hit.  She told Smith that Vincent was not affiliated with the B.G.F.  Zeke also remembered hearing something about the B.G.F., but he could not recall any talk about Williams' wife.

Zeke said Smith accused Vincent of repeatedly placing crank calls to one of defendants' mothers.  But Vincent was "groggy" and "nonresponsive."  He looked confused, and "would just kind of go in and out."  He answered defendants' questions vaguely, and offered something like an apology.

Zeke told the lead police investigator that while defendants seemed drunk, "they knew what they were doing."  At trial he testified that defendants were not slurring their words, but some of the things they said did not make sense and they kept changing their stories.  He thought "[t]hey were trying to confuse us."  Ana and Wanda similarly testified that when they described defendants as "rambling," "babbling," and talking "gibberish," they meant that defendants were untruthful, not incoherent.

Wanda testified that it looked for a moment as if defendants were going to leave the scene.  They walked down the trail, conferred for about a minute, and then came back.  That's when Williams punched Vincent in the face.  Ana testified that Williams slapped Vincent two to six times in the face.  According to Zeke, Williams slapped Vincent and Smith punched him.

Ana, Wanda, and Zeke testified that Vincent did nothing to provoke defendants.  Vincent was unarmed, made no threats, and made no move toward them.

Ana testified that Williams told Vincent to stand up and apologize for being at his house.  Vincent stood up and said, "I'm sorry," but did not apologize for anything in particular, "which seemed to make [Williams] even madder."  Williams said, "Oh, so now you're sorry."  At that point, Ana testified, "I think Razor told the chubby dude to stick Vincent."  Smith stabbed Vincent in the chest with the

3

cane sword, and he fell to the ground.  Williams said, "Look who looks stupid now," and Smith said something like, "I guess he's sorry now."  Smith said that he did not want to do it, but that he had to because the B.G.F. told him to.  Williams told Ana that the B.G.F. would be looking for her if she said anything to the police.

Wanda also recalled Williams wanting an apology from Vincent for something after he punched him.  Wanda watched from her mattress. Vincent was sitting when he was stabbed, and fell back on his mattress.  Zeke also remembered Vincent sitting on the mattress when he was stabbed.  Zeke testified that just before stabbing Vincent, Smith said, "blood in, blood out."  FN. 3  Smith stepped toward Vincent and put his weight behind the thrust of the sword.  After the stabbing Williams told Smith to "finish him" or "do it again," and Ana begged him not to.

> FN. 3  Zeke testified that Williams said little before the stabbing other than "a few things just in agreement with Mr. Smith."  The prosecutor argued to the jury that Zeke was mistaken and that Williams was doing the talking.  The prosecutor referred to Williams as "the planner," Smith as "the muscle," and the third man as "the lookout."

Wanda, Ana, and Zeke testified that the stabbing occurred between ten and 15 minutes after defendants woke them up.

Zeke testified that after the stabbing defendants "started messing with [Vincent], telling him to stand up and sit down" and saying that he was not badly hurt.  Ana helped Vincent to his feet three or four times, and defendants said, "Nah.  Get back down."  Wanda also recalled that defendants told Vincent that he was not badly hurt and ordered him to get up.  Vincent tried but staggered and fell.  He kept saying to Ana, "Mommy, I'm dying."  Ana "remember[ed] Vincent moaning and groaning, and [Williams] saying, 'If he's groaning like that, we'd might as well finish him off.'  And me telling him no, that he's just scared.  And then [Williams] telling me, 'Well, make that nigger climb up that hill then.'"  Vincent tried to walk up the hill toward the BART tracks, but slipped and rolled back onto Ana's lap.

Ana testified that she asked Williams to let her call an ambulance and Williams said, "No."  Wanda testified that when she asked Williams to let her call an ambulance, Williams told her that Vincent "wasn't stabbed that bad."

Wanda testified that defendants then stepped away and conferred.  Looking at Ana, Williams asked Smith, "Do you want her?"  Smith approached Ana, made a menacing gesture with his sword to frighten her, and said, "Come here."

Ana testified that, while holding the sword Smith grabbed her by the arm and pulled her behind the last freeway pillar in the jungle toward Sycamore.  At the preliminary hearing she estimated the distance to have been 27.5 feet from the mattresses, but it was measured by Oakland Police to have been 173 to 175 feet.  Smith told Ana to pull her jeans down and bend over with her hands on the pillar.  He penetrated her vagina with his penis, and ejaculated.

Wanda lost sight of Ana behind the pillar, but Zeke could see she was being raped.  Wanda testified that people walking by on Sycamore said something to Smith and Ana, but they were too far away for Wanda to hear what they said.  Zeke also testified that a man walked by on the sidewalk and said something.  According to Wanda, five minutes after Ana was taken away by Smith, she came back crying and said she had been raped.

Zeke testified that during the rape Vincent crawled down the trail and collapsed.  Wanda also saw where Vincent fell in bushes below the mattresses.  Ana testified that Wanda told her Vincent had rolled over toward some bushes, and she thought he was there trying to hide.

Ana, Wanda, and Zeke left the jungle through the hole in the fence.  Before they left, Williams told Wanda that she "knew how to keep [her] mouth closed."  Ana went to a nearby pay phone where she called 911.  Oakland Police Department records showed that 911 calls were placed at 8:42 and 8:43 a.m. about a stabbing and a body in the area.

Ana and Wanda returned to the jungle with a man named Shaka.  They found Al Benson on the trail downhill from the mattresses, crying.  Benson told Ana, "Don't come any closer," but Ana pushed him out of the way and saw Vincent lying on his back.  Shaka tried to give Vincent C.P.R. but Vincent was dead.  Wanda told Benson what had happened.

Police searched the jungle that morning in response to the 911 calls but did not find Vincent's body.  Another 911 call about a "possible DOA" was placed at 1:55 p.m., and the police found Vincent ten or 15 minutes later.  A trail of blood led from the mattresses to where the body lay in brush and tall grass, about 15 feet off the trail to the mattresses and 60 yards from the hole in the fence.

An autopsy performed by forensic pathologist Thomas Rogers showed that Vincent was killed by a stab wound to the chest.  The wound was one to one and one-half inches deep.  The blade penetrated a small part of the right lung called the hilar area, and punctured a pulmonary artery.  The wound was close to the heart, but might not have caused such major damage if it had been inflicted a little bit to the right or left of where it occurred.  Blood collected in the airways of his lungs, and approximately 800 cubic centimeters of blood collected in Vincent's chest cavity.  The wound would have caused his death within three to 45 minutes.  Vincent had cocaine and morphine in his system when he died.

In a statement taken at 2:30 p.m., Wanda lied to police, and said she did not see Williams in the jungle or witness the stabbing.  Ana and Wanda testified that they did not initially report the crimes because they were worried about the B.G.F.  Ana testified that she saw Williams later that day when she was walking with Benson outside the jungle.  Benson, who died before the trial in this case, yelled at Williams, saying, "What's wrong with you?  I want to know why you hurt my friend."

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

Smith was in possession of the cane sword when he was arrested at about 6:00 p.m. that same day for shoplifting at the Target store in El Cerrito.  Officer Christopher Purdy took Smith from the store to the El Cerrito Police Department and then to the Martinez Detention Facility. Purdy testified that on the way to the Martinez Detention Facility Smith said "he was going to put a $10,000 price on . . . my head," and mentioned the B.G.F.

Two days later, on May 30, Benson put Ana and Wanda in contact with the police.  They gave taped statements to the lead investigator, and identified Williams from a photo lineup.

Police retrieved the jeans Ana was wearing on the day of the incidents from a woman named Angela and had them frozen.  Early on May 31 Ana underwent a sexual assault examination.  The examination was performed by physician assistant Josh Luftig, who testified that Ana was "very disheveled" and "extremely upset."  Field described how she had been raped, and the results of the exam were consistent with the events Ana reported.

Benson brought Zeke into contact with the police on June 4.  Zeke gave a taped statement and identified Williams from a photo lineup.  Based upon information that Smith was involved in the case, Oakland police obtained the cane sword from the El Cerrito Police Department.  Ana and Wanda identified Smith in photo lineups in November.

Police obtained oral swabs of Smith's DNA, and Oakland Police Department criminalist Shannon Cavness determined that Smith's DNA matched DNA in sperm found on Field's jeans.  The match was to a certainty of one in 1.6 quintillion — a 16 with 17 zeros.  DNA collected from the jeans was also found to match that of Smith as shown in a national DNA database.

Ana was convicted of robbery in 1995, arrested for prostitution in 2001 and 2002, and on probation for possession of drugs at the time of the incidents.  She testified that the prosecution put her up in a hotel for about a week during trial and about a month at the time of the preliminary hearing.  The prosecutor provided her with food when they met, clothing, and two packs of cigarettes.

Wanda had three felony theft convictions, and was on probation at the time of trial for possession of drugs.  She testified that she and Ana were put up in hotels for one or two nights after giving their initial statements, and a week at the time of the preliminary hearing.

B. Williams' Defense and Prosecution Rebuttal
Smith did not testify at trial, but Williams did.  In rebuttal, the prosecution introduced Williams' taped statements to the police after he was arrested.

(1) Police Interviews
Williams was arrested on May 30, two days after the murder, and gave two statements in the early morning of May 31.  The lead investigator testified that when he told Williams he was investigating a death in the jungle, Williams at first denied that he

had anything to do with it. But he admitted in his statements that he was present when the stabbing occurred.

In his first statement, Williams said he was 44 years old, homeless, and known on the street as "Razor" or "Sampson." He had never seen the victim before but knew that the victim's girlfriend was a prostitute. He also knew the woman who was the girlfriend's "mother or grandmother." In the early morning of May 28, he smoked some crack by where he slept and then walked with two guys, a "fat dude" and a "skinny dude," through the hole in the fence into the jungle to get high again. He smoked more crack with the two dudes and they encountered the victim, the girlfriend, and the mother, who were also getting high. He was talking with the mother when the fat dude stabbed the victim with a cane sword. The blade of the sword came over his shoulder. He did not know why the stabbing occurred. He tried to stop it, telling the fat dude, "Stop, get back, what is you doing?" He told the girlfriend to get a doctor for the victim and left the scene.

In his second statement, Williams said he was smoking crack in the jungle when he heard the victim's voice, which he thought he recognized as that of a man he heard speaking in the background when he called his wife from jail, or after he was released from jail. The man's voice was one of three or four in the background during the call. Williams was pretty sure that while he was in jail, the victim had been flirting with his wife. He "went out there to 'front [the victim]," and asked him three times, "[W]hy you fucking with my wife?" He became suspicious when the victim did not respond, so he pushed the victim. The investigator asked Williams to push him as hard as he pushed the victim. When Williams did so, the investigator said, "Okay, so it was a good firm push." He told Williams, "[W]here I come from if somebody pushes you like that, you getting ready to fight. [¶] A. Yeah, pretty much. [¶] Q. Is that pretty much kinda what the thing was? [¶] A. Pretty much it was, but he didn't even—he didn't even respond. [¶] Q. What did he do? [¶] A. He went up and fell back. He didn't try to fight me."

The stabbing occurred right after the push. The blade came over Williams' right shoulder into [the victim's] chest. The chubby dude asked if he could "do [the victim] on up," which meant finish the victim, and he answered, "Let that shit go." The chubby dude, still holding the sword, told the girlfriend to "come here." The victim was groaning and wheezing, but the "Mexican guy" said there was nothing wrong with him. The Mexican guy gave him $10 after he said that the victim owed him for messing with his wife. He saw the girlfriend and the chubby dude having consensual sex, and left the jungle when they were finished. Williams was not affiliated with a gang.

(2) Williams' Trial Testimony
Williams initially testified that he had never seen Ana or Wanda before the proceedings in this case, nor did he remember seeing Smith on the day of the incidents, but he later acknowledged interacting with Ana and Wanda at the time.

Williams testified that two men he did not know, one heavyset, the

other tall and skinny, came by the mattress near the jungle where he slept the night before the incidents.  The heavyset man asked if he had an "asparatus," which meant a pipe.  He had one, and the three went to the jungle at 7:30 a.m. to smoke crack and drink brandy.  When they were smoking and drinking, Williams heard laughing and talking back by the pillars. He thought he recognized one of the voices as a man he had heard in the background of a three or four minute phone call he made to his wife from jail.  During the call, "[t]he man was talking about me running around with my chest all poked out."  He went over alone to confront the man who had been at his wife's house. He did not know if the other men followed behind him.

The man with the familiar voice was Vincent.  He was with Ana, Wanda, and Zeke.  They were all awake.  Williams approached Vincent and said, "You trying to hide?"  Vincent did not say anything, just stood looking at him.  He could not describe Vincent's demeanor because his memory of the events was "a blur."  He asked Vincent what he was doing at his house and kept saying, "Man, why you doing me like that?"  Williams asked Vincent where his car was because people told him that Vincent had been driving it.  He asked Vincent where his money was because his wife was receiving benefits he was getting.  When Vincent was unresponsive, Williams felt mocked and got upset.  Zeke gave him $10 to cool him down.

Williams started to walk away down the hill "[t]hen [Vincent] said something.  Then I turned back around.  I started to go back and approach him.  He started coming down the hill towards me.  When he came towards me, that's when I slapped him up."  Vincent's remark had been "[s]ome sort of slur," and he laughed when he said it.

On direct examination, Williams testified that after he slapped Vincent on the head he saw "a little flash" come over his shoulder and saw Vincent fall to the ground.  Although in his statements he told police that he had seen Vincent get stabbed, in fact he had not.  At the time of the incidents, his mind "wasn't even nowhere around."  He just told the investigator what he wanted to hear.

On cross-examination by the prosecution, Williams testified that he pushed Vincent in between the slapping and stabbing.  Williams became angry when Vincent uttered the slur as Williams was walking away.  Vincent was walking down the path as if he were coming to fight him.  When he was asked whether he slapped Vincent in anger or self-defense, Williams testified, "I don't know which one it was, because I reacted on my instinct. . . .  I approached him, mortal combat. . . .  I got in my mind . . .  I'm going to attack you first before you attack me, because this is mutual combat. . . .  I reached out with a slap, then a push."  He pushed him a second or two after the slap. Vincent fell and was getting up when he was stabbed.  Williams did not see the cane sword before the stabbing.

The prosecution elicited that the stabbing occurred three or four minutes after the push.  But on cross-examination by Smith, Williams said the stabbing occurred just two or three seconds later.  The heavyset man bumped into him when he saw the flash over his

1      shoulder.  He turned around and only then realized that the man had
       followed him to the mattress.

2      After the stabbing the heavyset man asked him something like, "Let
3      me finish it up," which Williams took as a request for permission to
       kill Vincent.  He told the man to "[h]old on."  But before he realized
       that Vincent was hurt, he told him, "[W]ho looks stupid now?"
4      Williams was mocking Vincent like Vincent had mocked him.

5      Williams asked Ana if she wanted the heavyset man because, before
       the stabbing,  Ana kept looking at him, rubbing her genitals, and
6      "smelling herself."  After the stabbing, he told Ana to get a doctor
       for Vincent, but she seemed like she did not care about him.  The
7      heavyset man whispered in Ana's ear for a few minutes, and they
       went to the back toward Sycamore.  He talked with Wanda about
8      Vincent having been at his house, and witnessed Ana and the man
       having "passionate" sex.  After Ana and the heavyset man returned
9      to the mattress, he and the heavyset man left the jungle and parted
       company.
10
       C. Jury Instructions and Deliberations
11     The jury was instructed on murder with malice, robbery felony-
       murder, and aiding and abetting. (CALCRIM Nos. 520 [defining
12     express malice]; 548 [malice and felony-murder theories; jurors
       need not agree on which theory applied]; 521 [distinguishing first
13     and second degree murder]; 540B [robbery felony-murder]; 549
       [continuous transaction required]; 1600 [elements of robbery]; 401
14     [defining aiding and abetting].) The jury was also instructed on the
       findings required to convict defendants of special circumstance first
15     degree murder. (CALCRIM Nos. 730 [murder during commission of
       a robbery]; 703 [aider and abettor must be major participant and act
16     with intent to kill or reckless indifference to human life].)
       Instructions were given on voluntary manslaughter based on heat of
17     passion (CALCRIM No. 570), and on the relevance of intoxication
       (CALCRIM Nos. 404, 625).
18
       Approximately nine court days were spent presenting evidence and
19     arguments in the case. The jury returned guilty verdicts in a little
       over four hours.
20

21     *People v. Williams*, 2012 WL 4479011, *1-7 (Cal. Ct. App. Oct. 1, 2012) (footnotes omitted).

22     A.     Procedural History

23            On June 10, 2010, the jury found both defendants guilty of first-degree special

24     circumstance murder and found codefendant Smith guilty of rape.  3CT at 761-64; 9RT at 1646-

25     50.  On August 27, 2010, the trial court sentenced Mr. Williams to life without parole.  2CT at

26     562, 564.

27            Mr. Williams appealed.  The California Court of Appeal affirmed his conviction.

28     *Williams*, 2012 WL 4479011 at *1.  The California Supreme Court summarily denied his petition

United States District Court
Northern District of California

                                                    9

for review.  Answer, Exs. 8, 9.  Mr. William then filed this petition.  Docket No. 1.  The petition was stayed so Mr. Williams could exhaust an additional ineffective assistance of counsel claim. Docket No. 18.  Mr. Williams exhausted the claim and filed the operative second amended petition.  Docket No. 26 ("Petition").  The Court lifted the stay but dismissed the newly exhausted ineffective assistance of counsel claim for failing to state a cognizable claim.  Docket No. 27.  The Court later granted Respondent's motion to dismiss and dismissed another ineffective assistance of counsel claim as procedurally defaulted.  Docket No. 30.

Mr. Williams continues with the remaining claims alleging that: (1) the trial court erred by failing to instruct on manslaughter and imperfect defense of others; (2) the trial court erred by failing to instruct whether the jury could consider his intoxication with respect to if he was acting with reckless indifference for human life; (3) the admission of the co-defendant's hearsay statement violated his right to confront the witness; and (4) there was insufficient evidence to support a conviction under the felony murder rule.  Petition at 5-8.

### III.  JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this action for a writ of habeas corpus under 28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the petition concerns the conviction and sentence of a person convicted in Alameda County, California, which is within this judicial district.  28 U.S.C. §§ 84, 2241(d).

### IV.  STANDARD OF REVIEW

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review.  A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of

United States District Court
Northern District of California

the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411.  "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable."  *Id.* at 409.

The state-court decision to which § 2254(d) applies is the "last reasoned decision" of the state court, if there is a reasoned decision.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991). When confronted with an unexplained decision from the last state court to have been presented with the issue, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale.  It should then presume that the unexplained decision adopted the same reasoning."  *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

## V.    **DISCUSSION**

A.    Lesser Included Offenses

Mr. Williams asserts that the trial court erred by failing to *sua sponte* instruct the jury that the victim's killing could have been voluntary manslaughter because codefendant Smith stabbed the victim in the unreasonable defense of Mr. Williams.  Petition at  5, 7.

1.    Background

The California Court of Appeal set forth relevant state law and denied this claim.  The court stated:

Defendants maintain that the court had a sua sponte duty to instruct the jury that Vincent's killing could be found to have been voluntary manslaughter rather than murder because Smith stabbed Vincent in unreasonable defense of Williams.  "California law requires a trial court, sua sponte, to instruct fully on all lesser necessarily included offenses supported by the evidence."  (*People v. Breverman* (1998) 19 Cal. 4th 142, 148–149 (*Breverman*).)  Defendants' jury was instructed on voluntary manslaughter based on heat of passion, but "[i]n a murder case . . . both heat of passion and unreasonable self-defense, as forms of voluntary manslaughter, must be presented to the jury if both have substantial evidentiary support."  (*Id.* at p. 160.)

. . .

Defendants argue that the jury could have reasonably found that Smith actually but unreasonably believed that he had to stab Vincent with his cane sword to defend Williams "from imminent danger of death or great bodily injury."  (*Randle, supra*, 35 Cal. 4th at p. 997.)  In support of that argument, defendants posit the following scenario: Vincent uttered a slur and advanced down the hill toward Williams as if wanting to fight.  Williams is only five feet, five or six inches tall, and the autopsy showed that Vincent was five feet 11 inches tall and weighed 177 pounds.  Vincent was in "a dominant uphill position," where "a larger person . . . often looks even larger than he is."  Faced with the prospect of what he called "mortal combat," Williams slapped Vincent because he actually, even if unreasonably, "believed he had to defend himself before [Vincent] attacked him."  "[I]mmediately after" Williams slapped Vincent, Smith stabbed Vincent with the cane sword.  Smith might have shared Williams' actual, if unreasonable, belief in the need to defend against Vincent because Smith "was standing right behind Williams" and "was able to see everything which Williams saw and hear everything which Williams heard."

One of the flaws in this argument is that it ignores a good deal of Williams' own testimony.  While Williams initially testified that the stabbing followed the slap, he later clarified that he pushed Vincent to the ground before the stabbing, as he told police in his interview.  Vincent was not in an "uphill position" when he was stabbed, he was getting up after he was pushed by Williams.  Vincent was unarmed, had made no threat, and, as Williams told the police, he had not fought back after being pushed.  Since Williams did not know that Smith was behind him until the stabbing occurred, he is only speculating that Smith might have heard the slur allegedly uttered by Vincent.  While we cannot weigh the evidence, we are not obliged to ignore it.  Williams' description of the incident bears on whether the evidence was substantial enough to warrant consideration of mistaken defense of another.

According to Williams, he instigated the physical altercation by slapping Vincent and pushing him to the ground.  He thereby forfeited his right to claim that he acted in unreasonable self-defense, as well as Smith's right to so act on his behalf.  "'It is well established that the ordinary self-defense doctrine—applicable when a defendant reasonably believes that his safety is endangered—may

1

> not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created the circumstances under which his adversary's attack or pursuit is legally justified. [Citations.] It follows, a fortiori, that the imperfect self-defense doctrine cannot be invoked in such circumstances." (*Randle*, *supra*, 35 Cal. 4th at p. 1001.) A defendant "is not entitled to invoke the doctrine of imperfect defense of others [if] he created the circumstances leading to the killing." (*Id*. at p. 1002.)

2

3

4

5

> Also, no reasonable jury "'could [have found] persuasive'" (*Breverman*, supra, 19 Cal.4th at p. 162) defendants' contention that Smith might have thought it necessary to stab Vincent with his cane sword to protect Williams from "imminent danger of death or great bodily injury" (*Randle*, supra, 35 Cal. 4th at p. 997) on the facts to which Williams testified.

6

7

8

9

> For either of these independently sufficient reasons, it was unnecessary to instruct the jury on imperfect defense of another.

10

11

*Williams*, 2012 WL 4479011 at *9-10.

12

As the last reasoned decision from a state court, the California Court of Appeal's decision

13

is the decision to which § 2254(d) is applied. *See Wilson*, 138 S. Ct. at 1192. Mr. Williams is

14

entitled to habeas relief only if the California Court of Appeal's decision was contrary to, or an

15

unreasonable application of, clearly established federal law from the U.S. Supreme Court, or was

16

based on an unreasonable determination of the facts in light of the evidence presented.

17

      2.   <u>Analysis</u>

18

Mr. Williams' claim fails because the Supreme Court has never recognized the right he

19

asserts. Although instructions on lesser-included offenses must be given in capital cases, *Beck v.*

20

*Alabama*, 447 U.S. 625 (1980), "[t]here is no settled rule of law on whether *Beck* applies to

21

noncapital cases such as the present one. In fact, this circuit, without specifically addressing the

22

issue of extending *Beck*, has declined to find constitutional error arising from the failure to instruct

23

on a lesser included offense in a noncapital case." *Turner v. Marshall*, 63 F.3d 807, 819 (9th Cir.

24

1995), *overruled on other grounds by Tolbert v. Page*, 182 F.3d 677, 685 (9th Cir. 1999) (en

25

banc). The failure of a state trial court to instruct on lesser-included offenses in a noncapital case

26

does not present a federal constitutional claim, particularly when no such instruction was

27

requested. *Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000); *see also Windham v. Merkle*, 163

28

F.3d 1092, 1105-06 (9th Cir. 1998).

It is true that under Ninth Circuit precedent, "the defendant's right to adequate jury instructions on his or her theory of the case might, in some cases, constitute an exception to the general rule." *Solis*, 219 F.3d at 929 (citing *Bashor v. Risley*, 730 F.2d 1228, 1240 (9th Cir. 1984). *Solis* suggests, however, that there must be substantial evidence to warrant the instruction on the lesser-included offense. *Solis*, 219 F.3d at 929-30 (no duty to instruct on voluntary manslaughter as lesser included offense to murder because evidence presented at trial precluded a heat of passion or imperfect self-defense instruction; no duty to instruct on involuntary manslaughter because evidence presented at trial implied malice).

Notwithstanding the Ninth Circuit's holding that a defendant's right to present a defense might in some circumstances require an instruction on a lesser-included offense, the Supreme Court has never so squarely held. "[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.' § 2254(d)(1)." *Glebe v. Frost*, 574 U.S. 21, 24 (2014). Without such a Supreme Court holding, the California Court of Appeal's rejection of the claim that the failure to instruct on the lesser offense violated Mr. Williams' federal constitutional rights cannot be said to be "contrary to" or involve "an unreasonable application of clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1); *see, e.g., Bortis v. Swarthout*, 672 F. App'x 754 (9th Cir. 2017) (denying habeas relief; state court properly considered failure to give lesser-included offense instruction as only a state law error because "[t]here is no Supreme Court precedent establishing that a state trial court is required to instruct on lesser included offenses in noncapital cases.").

Even if there were such clearly established federal law from the Supreme Court that a lesser-included offense instruction must be given when that is the defendant's theory of defense, Mr. Williams would not be entitled to relief. Codefendant Smith, who stabbed the victim, did not testify and there was no other evidence that the victim posed a threat to Mr. Williams. The California Court of Appeal noted that Mr. Williams' argument in this claim contradicts much of his own testimony at trial. *Williams*, 2012 WL 4479011 at *9. Mr. Williams testified that the victim was getting up from the ground after being pushed down when he was stabbed. *Id.* Thus, the victim was not in an uphill position potentially threatening Mr. Williams.

14

1    In *Menendez v. Terhune*, 422 F.3d 1012 (9th Cir. 2005), the Ninth Circuit addressed

2   whether, under California law, the trial court properly declined to instruct the jury on imperfect

3   self-defense based on the lack of substantial evidence. *Id.* at 1028. *Menendez* held, "The court's

4   determination that this instruction was not appropriate and the state appellate court's affirmance of

5   that decision resulted from interpretation of state law. Any error in the state court's determination

6   of whether state law allowed for an instruction in this case cannot form the basis for federal habeas

7   relief. Estelle, 502 U.S. at 67-68. The state court . . . determined that no instruction was available

8   to Petitioners because they failed to provide a basis upon which the instruction could be given.

9   Quite simply, that should be the final word on the subject." *Id.* at 1029. "In addition, a state trial

10   court's finding that the evidence does not support a claim of imperfect self-defense is entitled to a

11   presumption of correctness on federal habeas review." *Id.* citing *Hartman v. Summers*, 120 F.3d

12   157, 161 (9th Cir. 1997). Similarly, in this case there was no evidence to support a claim of

13   imperfect self-defense and the corresponding jury instruction. The record is not sufficient to

14   disturb the presumption of correctness attached to the state court's finding.

15    The California Court of Appeal's rejection of the federal constitutional claim was not

16   "contrary to," or "an unreasonable application of, clearly established Federal law, as determined

17   by the Supreme Court of the United States" because there is no such law. 28 U.S.C. § 2254(d).

18   Mr. Williams is not entitled to the writ on this claim.

19   B.    Voluntary Intoxication

20    Mr. Williams contends that the trial court should have instructed the jury that it could

21   consider his voluntary intoxication in deciding whether he knew he was acting with reckless

22   indifference to human life when he aided and abetted in the murder. Petition at 5, 7.

23    1.    Background

24    Mr. Williams was found guilty of robbery special circumstance first degree murder. 3CT

25   at 761; 9RT at 1646-47. To be convicted of that charge as an aider and abettor, the jury needed to

26   determine that Mr. Williams acted either with intent to kill or reckless indifference to human life.

27   *Williams*, 2012 WL 4479011 at *10; 2CT at 496.

28    The trial court instructed the jury pursuant to CALCRIM 625 that, "You may consider

United States District Court
Northern District of California

evidence, if any, of voluntary intoxication only in a limited way.  You may consider that evidence only in deciding whether the defendant acted with an intent to kill, or the defendant acted with deliberation and premeditation, or the defendant intended to commit robbery or intended to aid and abet the commission of murder, robbery and/or assault with a deadly weapon.  [¶] . . . [¶]  You may not consider evidence of voluntary intoxication for any other purpose."  2CT at 502.  Mr. Williams argues that the jury was erroneously instructed because it could not consider whether his intoxication prevented him from knowing that his criminal activity involved reckless indifference to human life.  *Williams*, 2012 WL 4479011 at *10.  As will be discussed below, CALCRIM 625 did provide the jury an opportunity to find that Mr. Williams' intoxication prevented him from forming an intent to kill or commit a robbery.  The jury found that the intoxication did not negate his intent.

The California Court of Appeal denied this claim.  The court stated:

> Respondent contends that this argument was forfeited because Williams did not request an instruction on voluntary intoxication as applied to the special circumstance.  However, while a trial court has no sua sponte duty to instruct on the relevance of intoxication, if it does so instruct, it must do so correctly.  (*People v. Mendoza* (1998) 18 Cal. 4th 1114, 1134 (Mendoza).)  Respondent maintains that the instruction given was correct, and at most incomplete.  But the instruction did not simply fail to advise that intoxication could be considered for the purpose Williams identifies, it expressly precluded any such consideration.  Accordingly, the alleged error can be properly raised.

> The parties dispute whether voluntary intoxication can be considered in deciding whether a defendant has acted with reckless indifference to human life.  This issue is apparently one of first impression.  The parties' positions are based primarily on their different readings of the *Mendoza* case.  (*See also People v. Reyes* (1997) 52 Cal. App. 4th 975, 982-985, cited with approval in *Mendoza*, *supra*, 18 Cal. 4th at p. 1131.)  We need not resolve the dispute because we conclude, for a number of reasons, that any error in failing to give the contested instruction was harmless beyond a reasonable doubt.  (*See People v. Carter* (2005) 36 Cal. 4th 1114, 1187 [prejudice from erroneous failure to instruct on element of a special circumstance is measured under *Chapman v. California* (1967) 386 U.S. 18, 24].)

> Williams observes that the findings required of the jury under other instructions did not obviate an instruction that voluntary intoxication could impact his possible reckless indifference to human life.  The jury was instructed that it could convict Williams of murder as an aider and abettor if it found that he knew Smith intended to commit

murder and he intended to encourage or facilitate the murder's commission.  (CALCRIM No. 401; *Mendoza*, *supra*, 18 Cal.4th 1123 [knowledge and intent required for aiding and abetting].)  Jurors who were persuaded that Williams aided and abetted a murder would not need to decide whether he acted with reckless indifference to human life because they would have already determined that he intended to kill the victim.  (CALCRIM No. 703.)  However, the jury was also instructed that it could convict Williams of felony-murder if it found that he "intended to commit or intended to aid and abet another in committing robbery." (CALCRIM No. 540B.)  Any jurors who convicted Williams solely on the basis that he committed a robbery felony murder would have concluded he acted with specific intent.  In order to find the murder was a special circumstance killing, the jury would have had to decide whether he committed the robbery or aided and abetted its commission with the requisite indifference to human life.

However, the jury was instructed that it could consider whether intoxication prevented Williams from forming an intent to kill, or an intent to commit or facilitate a robbery (CALCRIM No. 625), and the verdicts show that the jurors did not believe that intoxication had a mitigating effect on Williams' specific criminal intent.  Given the jury's rejection of the intoxication defense as to Williams' intent, there was no realistic prospect that it would have concluded that his intoxication made him unable to appreciate that his conduct posed a grave risk of death.  (*Cf. People v. Hood* (1969) 1 Cal.3d 444, 458 [a drunken person may be unable to form any intent beyond "an intent to do something simple, such as strike another," but is "more likely to act rashly and impulsively"].)  If Williams was not too intoxicated to formulate and pursue specific criminal objectives, then it is unlikely that he was too intoxicated to know the grave risk of death associated with his behavior, a matter of mere comprehension rather than purpose.

Moreover, a trial court must give a requested instruction only if it is supported by substantial evidence, that is, evidence sufficient to deserve jury consideration, and unsupported theories should not be presented to the jury.  (*People v. Marshall* (1997) 15 Cal. 4th 1, 40-41.)  In context, the evidence provided no significant support for a claim that Williams might have been too intoxicated to appreciate the gravity of the situation he and Smith created.  Robbing the inhabitants of an isolated homeless encampment while armed with a cane sword involved an obvious risk of deadly violence.  As the prosecutor put it in closing argument, the cane sword was "a major weapon designed to kill," and "[w]hen you go to rob a bunch of people with a bunch of other people and you take a weapon and you shock them and surprise them and terrorize them . . . you should not be surprised at all that this ends up in violence somehow."

Williams argues that a substantial issue was presented as to "whether [his] intoxication could have interfered with his seeing and understanding the true nature of the cane.  Given how chaotic the scene was, and given that the witnesses were collectively unsure when the sword was unsheathed, [he] could well have been unaware of the true nature of the cane, because his perception or understanding was impaired by his intoxication."  In light of the jury

finding of Williams' specific intent, this argument is neither logical nor persuasive.

The argument rests in part on Williams' assertion that the evidence in this case is "somewhat muddled, because it involved a confusing dispute between drunken crackheads and slowly awakening heroin addicts." But while Ana, Wanda, and Zeke may have differed on details, such as precisely when Smith unsheathed the sword (see also, e.g., fn. 3, ante ), they were clear and consistent in essential respects about what transpired. They testified that Williams and Smith woke them, demanded money, and threatened Vincent, that Vincent did nothing to provoke Williams or Smith, and that Smith proceeded to stab Vincent and rape Ana at knifepoint. They testified that Williams and Smith said things they knew to be incorrect, but did not describe a "chaotic" scene.

As for when the sword was unsheathed: Ana testified that she saw the blade when she first woke up; Wanda testified that she saw Smith take the cane apart just before he stabbed Vincent; and Zeke testified that he saw Smith hold the sword in his hand for a couple of minutes before the stabbing. These discrepancies were immaterial. Ana testified that Smith pointed the sword at her and asked Williams whether he wanted him to stab her, and that Williams told Smith to stick Vincent with the sword. Wanda corroborated Ana insofar as she testified that Ana woke her up screaming in fear of mortal injury, and that Smith asked Williams, "Do you want me to take [Ana] out?" Zeke testified that, in addition to Smith's cane sword, Williams and the third man were armed with clubs. The testimony of these witnesses as a whole effectively negated any doubt that Williams was aware of the sword and the risk of deadly harm attendant to the circumstances.

Even though Williams testified that he did not realize the heavyset man had a sword before Vincent was stabbed, his testimony showed that his lack of awareness was based on a claim of ignorance not intoxication. Williams points to his testimony that he "never paid attention" to when Smith unsheathed the sword, and implies that, had he not been intoxicated, he might have earlier noticed the weapon. But this argument is based upon a distortion of his testimony. Williams testified that he did not know until the moment Vincent was stabbed that the heavyset man had followed him during the confrontation and was standing behind him when Vincent was rising to his feet after Williams shoved him. As Williams put it in his reply brief, "[o]ne ordinarily does not see what is going on behind him." Williams' testimony about not paying attention was, in context, his way of saying he did not know of or see the sword until the stabbing occurred. But the verdicts show the jury rejected this version of the events, and there is no reasonable prospect that consideration of the intoxication instruction would have led the jury to believe this facet of Williams' story.

We note finally that this was not a close case for the jury, which took only four hours to convict the defendants after hearing nearly two weeks of evidence and argument. Williams' testimony, including his astonishing claim that Ana had passionate sex with the heavyset man who had just stabbed her boyfriend in the chest was

1

scarcely credible.

2

In light of the swiftness of the verdicts, the findings that had to be
made concerning Williams' specific intent despite his intoxication,
and the lack of evidence that Williams was too intoxicated to notice
the cane sword or appreciate the grave risk of death his actions
posed, the failure to instruct that intoxication might have prevented
him from acting with reckless indifference to human life was
harmless beyond a reasonable doubt.

3

4

5

6

*Williams*, 2012 WL 4479011 at *10-12 (footnote omitted).

7

        As the last reasoned decision from a state court, the California Court of Appeal's decision

8

is the decision to which § 2254(d) is applied.  *See Wilson*, 138 S. Ct. at 1192.  Mr. Williams is

9

entitled to habeas relief only if the California Court of Appeal's decision was contrary to, or an

10

unreasonable application of, clearly established federal law from the U.S. Supreme Court, or was

11

based on an unreasonable determination of the facts in light of the evidence presented.

12

                2.        Analysis

13

        To obtain federal habeas relief for an error in the jury instructions, a petitioner must show

14

that the error "so infected the entire trial that the resulting conviction violates due process."

15

*Estelle v. McGuire*, 502 U.S. 62, 72 (1991).  A jury instruction violates due process if it fails to

16

give effect to the requirement that "the State must prove every element of the offense."  *Middleton*

17

*v. McNeil*, 541 U.S. 433, 437 (2004).  "A single instruction to a jury may not be judged in artificial

18

isolation, but must be viewed in the context of the overall charge."  *Id.* (quoting *Boyde v.*

19

*California*, 494 U.S. 370, 378 (1990)).  "Even if there is some 'ambiguity, inconsistency, or

20

deficiency' in the instruction, such an error does not necessarily constitute a due process

21

violation."  *Waddington v. Sarausad*, 555 U.S. 179, 190 (2009) (quoting *Middleton*, 541 U.S. at

22

437).

23

        Where a potentially defective instruction is at issue, the court must inquire whether there is

24

a "reasonable likelihood" that the jury applied the challenged instruction in a way that violates the

25

Constitution.  *Estelle*, 502 U.S at 72 & n.4; *Boyde*, 494 U.S. at 380.  Even if there is a

26

constitutional error in the instructions, habeas relief is not available unless the error had a

27

substantial and injurious effect or influence in determining the jury's verdict.  *Calderon v.*

28

*Coleman*, 525 U.S. 141, 146-47 (1998); *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

United States District Court
Northern District of California

19

1    The California Court of Appeal cited the harmless error standard from *Chapman v.*

2    *California*, 386 U.S. 18, 36 (1998), in reaching its conclusion that any error was harmless under

3    any standard.  Under *Chapman*, "before a federal constitutional error can be harmless, the court

4    must be able to declare a belief that it was harmless beyond a reasonable doubt."  *Chapman*, 386

5    U.S. at 24.  If the state court finds an error harmless, that determination is reviewed under the

6    deferential AEDPA standard.  This means that relief is not available for the error "unless the state

7    court's harmlessness determination itself was unreasonable."  *Davis v. Ayala*, 135 S. Ct. 2187,

8    2199 (2015) (quoting *Fry v. Pliler*, 551 U.S. 112, 119 (2007)).  In other words, a federal court may

9    grant relief only if the state court's harmlessness determination "was so lacking in justification

10   that there was an error well understood and comprehended in existing law beyond any possibility

11   for fairminded agreement."  *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).  *See*,

12   *e.g.*, *Rademaker v. Paramo*, 835 F.3d 1018, 1020-24 (9th Cir. 2016) (California Court of Appeal's

13   determination that instructional error regarding element of asportation was harmless beyond a

14   reasonable doubt was not an objectively unreasonable application of *Chapman* because the

15   evidence supported jury's finding that petitioner carried victim a "substantial distance" under

16   either definition of asportation).  But if the federal court determines that the state court's harmless

17   error analysis was objectively unreasonable, it also must find that the error was prejudicial under

18   *Brecht* before it can grant relief.  *See Fry*, 551 U.S. at 119-20 (§ 2254(d)(1) did not displace

19   *Brecht*).  To find the error prejudicial under *Brecht*, the court must find that the error had a

20   "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht*, 507 U.S.

21   at 623.

22   The California Court of Appeal held that even if there was an error in failing to give the

23   instruction, the error was harmless.  Mr. Williams has failed to meet the high standard and show

24   that the California Court of Appeal's harmlessness determination was unreasonable.   Mr.

25   Williams argues that an instruction should have been issued that would have allowed the jury to

26   consider whether his intoxication prevented him from knowing that his criminal activity involved

27   reckless indifference to human life.

28   The California Court of Appeal noted that CALCRIM 625 which was given, instructed the

20

jury that it could consider whether intoxication prevented Mr. Williams from forming an intent to kill or an intent to commit or facilitate a robbery. *Williams*, 2012 WL 4479011 at *11. The state court held that the verdicts show that the jury did not believe intoxication had a mitigating effect on Mr. Williams' specific criminal intent. *Id*. The state court further stated that because the jury rejected the intoxication defense as to Mr. Williams specific intent, the was no reasonable probability that the jury would have concluded that Mr. Williams' intoxication rendered him unable to understand that his criminal activity involved reckless indifference to human life. *Id*. This harmless determination was not unreasonable or lacking in justification.

Moreover, to find Mr. Williams guilty as an aider and abettor, jurors would not need to decide whether he acted with reckless indifference to human life if it had determined that Mr. Williams intended to kill the victim. *Williams*, 2012 WL 4479011 at *11; 2CT at 496. In this case, the jury did not believe intoxication negated his intent to kill the victim and found Mr. Williams guilty. The state court's reasoning that the failure to provide such an instruction for reckless indifference to human was thus harmless is supported by the record and was not unreasonable.[1]

The state court also noted that a trial court must give a requested instruction only if it is supported by the evidence. *Williams*, 2012 WL 4479011 at *11. The state court determined that Mr. Williams knew his behavior was dangerous to human life and this was supported by the evidence. As described above, the state court set forth the relevant testimony that demonstrated Mr. Williams was aware of the sword and the risk of deadly harm. *Id*. at 12. Even if the state court's harmless error analysis was objectively unreasonable, Mr. Williams has failed to show that the error was prejudicial under *Brecht*, in light of the evidence presented. To obtain relief, Mr. Williams must demonstrate that the failure to give the desired instruction had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht* at 623. In light of the

---

[1] In addition, the jury was also instructed that it could convict Mr. Williams of felony-murder if he was found to have intended to commit or intended to aid and abet another in committing robbery. *Williams*, 2012 WL 4479011 at *11; 2CT at 487. If Mr. Williams was convicted on this theory, the jurors would have again concluded that he acted with specific intent despite the voluntary intoxication instruction.

United States District Court
Northern District of California

1    evidence that Mr. Williams was aware of the sword and the risk of harm and that the jury did not

2    believe intoxication had a mitigating effect on Mr. Williams' specific criminal intent, Mr.

3    Williams has failed to show that the failure to give the instruction had an effect on the jury's

4    verdict that would meet the high threshold of *Brecht*.  For all these reasons, Mr. Williams is not

5    entitled to the writ on this claim.

6    C.    Admission of Statement

7         Mr. Williams argues that the admission against him of codefendant Smith's statement to a

8    police officer about the Black Guerrilla Family ("BGF") prison gang violated his right to confront

9    a witness pursuant to *Bruton v. United States*, 391 U.S. 123 (1968) and *Crawford v. Washington*,

10   541 U.S. 36 (2004).  Petition at 8.

11        1.    Background

12        The California Court of Appeal set forth relevant background for this claim.  The court

13   stated:

> Williams objected below to admission against him of Officer
> Purdy's testimony that, following Smith's arrest at the Target store
> for shoplifting, he mentioned the B.G.F. and threatened to put a
> $10,000 price on Purdy's head.  The basis for Williams' counsel's
> objection was that he "was not going to have the opportunity to
> confront [Smith] about hearsay statements," that Smith's threat was
> a "a lot more prejudicial than probative"; and that admission of the
> threat would violate *Crawford v. Washington* (2004) 541 U.S. 36
> (*Crawford*).
>
> The court reasoned that the threat was admissible against Williams
> to the extent it tended to corroborate the testimony of Ana, Wanda,
> and Zeke that defendants referred to a murder contract and the
> B.G.F. during the robbery.  The threat was relevant to show that
> these witnesses were "remembering things honestly" and had not
> "made up stuff."  The truth of the threat was irrelevant.  The court
> had "no reason to believe and [was] not suggesting [Smith] would,
> indeed, have some relationship with the BGF; and he would have a
> hit for ten grand put on the officer's head."  Because the threat was
> not admitted for its truth, its admission did not violate the Sixth
> Amendment right of confrontation or "the *Aranda–Bruton* [*People
> v. Aranda* (1965) 63 Cal. 2d 518; *Bruton v. United States* (1968) 391
> U.S. 123] line of cases."  The threat was not unduly prejudicial
> because the jury had "already heard this topic" from the percipient
> witness.  The court instructed the jury at length that the threat was
> not being offered as evidence against Williams for its truth, or as
> evidence of Smith's state of mind, but only "to show that certain
> statements were made."

22

The prosecutor referred briefly to the threat in closing argument, while discussing evidence that corroborated the eyewitness' accounts: "Ten hours, after some discussion about BGF and a contract or a hit, Defendant Smith utters the same basic topic at Officer Purdy.  What does that show you?  That when Smith feels threatened, angered, annoyed, whatever, he starts popping off about the BGF.  Is he BGF? . . .  No reason to believe that he is.  I couldn't care less.  It's merely the uttering of the words 'BGF' that you go 'Gee, that sounds familiar.  Oh yes, that was mentioned back at the stabbing and the rape."  The prosecutor prefaced these remarks by saying, "Nothing to really hang your hat on . . . ."

*Williams*, 2012 WL 4479011 at *12-13.

The California Court of Appeal rejected Mr. Williams' claim.  The court stated:

Williams contends on appeal that admission against him of Smith's threat violated his rights under *Aranda-Bruton* and *Crawford*.  We disagree.

"The *Aranda/Bruton* rule bars admission in a joint trial of one defendant's out-of-court confession that powerfully and facially incriminates a codefendant, even if the court instructs the jury to consider the confession only against the declarant . . . .  The rule . . . presumes the statement is an admissible admission by the declarant and inadmissible hearsay against the codefendant."  (*People v. Smith* (2005) 135 Cal. App. 4th 914, 921-922 (*Smith*).)  The threat here was not inadmissible hearsay against Williams.  Williams calls the trial court's reasoning on the point "oxymoronic," but the court was entirely correct.  The threat was not offered for its truth, i.e., to show that Smith actually intended to arrange a contract killing of the officer, but only to show that he made statements to the officer like those reported by prosecution witnesses, i.e., that the statements were made.

*Aranda-Bruton* was not violated for the additional reasons that Smith's threat was not powerfully or facially incriminating of Williams.  (*Smith, supra*, 135 Cal. App. 4th at pp. 921-922; *see also People v. Fletcher* (1996) 13 Cal. 4th 451, 455; *People v. Ardoin* (2011) 196 Cal. App. 4th 102, 137–138.)  The threat was not facially incriminating of *Williams* because it did not, in isolation, involve him in any way.  It became incriminating "'only when linked to other admitted evidence'"-the statements Ana, Wanda, and Zeke heard in the jungle.  (*Id.* at p. 138.)  The threat was not powerfully incriminating of Williams because it merely served to generally corroborate the veracity of the eyewitnesses-to show, as the trial court said, that they were not making things up.  The threat was only a minor part of the case against Williams.  As the prosecutor said, it was not something that the jury could hang its hat on.

Nor did admission of the threat violate *Crawford*.  As the court in *People v. Cage* (2007) 40 Cal.4th 965, 984 (*Cage*), stated in discussing *Crawford* and *Davis v. Washington* (2006) 547 U.S. 813: "[T]he confrontation clause is concerned solely with hearsay statements that are testimonial. . . . [T]hough a statement need not be

23

> sworn under oath to be testimonial . . . the statement must have been
> given and taken primarily for the purpose ascribed to testimony-to
> establish or prove some past fact for possible use in a criminal trial."
> *Crawford* is inapplicable here because, as we have explained, the
> threat, as used against Williams, was not hearsay.
>
> Nor was the threat testimonial.  Williams speculates that the threat
> may have been uttered in response to questioning by Purdy, but that
> seems unlikely.  Purdy testified at the Evidence Code section 402
> hearing on the threat's admissibility that he could not remember
> anything about his conversation with Smith during the ride from the
> El Cerrito Police Department to the Martinez Detention Facility
> other than the threat.  Purdy testified that Smith became agitated at
> the El Cerrito Police Department, kept interrupting him when he
> tried to read him his Miranda rights, and never signed a form
> waiving those rights.  Even in the unlikely event that Purdy was later
> questioning Smith in the police car when the threat was made, the
> threat was plainly not a statement given "to establish or prove some
> past fact for possible use in a criminal trial."  (*Cage*, *supra*, 40 Cal.
> 4th at p. 984.)

*Williams*, 2012 WL 4479011 at *13-14.

As the last reasoned decision from a state court, the California Court of Appeal's decision is the decision to which § 2254(d) is applied.  *See Wilson*, 138 S. Ct. at 1192.  Mr. Williams is entitled to habeas relief only if the California Court of Appeal's decision was contrary to, or an unreasonable application of, clearly established federal law from the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented.

2.      Analysis

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with witnesses against him."  U.S. Const. amend. VI.  The ultimate goal of the Confrontation Clause "is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee.  It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Crawford*, 541 U.S. at 61.

The Confrontation Clause applies to all "testimonial" statements.  *See Crawford*, 541 U.S. at 50-51.  "Testimony . . . is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact."  *Id.* at 51 (internal quotation marks and brackets omitted); *id.* at 68 ("[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations").  The "primary

United States District Court
Northern District of California

purpose" test establishes the boundaries of testimonial evidence.  Statements are testimonial: (1) "when they result from questioning, 'the primary purpose of [which was] to establish or prove past events potentially relevant to later criminal prosecution,' *Davis v. Washington*, 547 U.S. 813, 822 (2006)," and (2) "when written statements are 'functionally identical to live, in-court testimony,' 'made for the purpose of establishing or proving some fact' at trial, *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310-11 (2009)."  *Lucero v. Holland*, 902 F.3d 979, 989 (9th Cir. 2018) (alteration in original) (citing *Ohio v. Clark*, 135 S. Ct. 2173, 2179 (2015)).  *See, e.g., Davis v. Washington*, 547 U.S. 813, 826-28 (2006) (victim's frantic statements to a 911 operator naming the assailant who had just hurt her were not testimonial); *id.* at 829–30 (victim's statements to officer telling him what had happened were testimonial, as there was no emergency in progress and were made after officer had separated victim and assailant).  For purposes of federal habeas corpus review, the standard applicable to violations of the Confrontation Clause is whether the inadmissible evidence had an actual and prejudicial effect upon the jury.  *See Hernandez v. Small*, 282 F.3d 1132, 1144 (9th Cir. 2002) (citing *Brecht*, 507 U.S. at 637.

Furthermore, "a defendant is deprived of his Sixth Amendment right of confrontation when [a] facially incriminating confession of a nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the codefendant." *Richardson v. Marsh*, 481 U.S. 200, 207 (1987) (citing *Bruton*, 391 U.S. at 135-36.  *Bruton* is only implicated when the codefendant's out-of-court statements are testimonial.  *Lucero v. Holland*, 902 F.3d 979, 987-88 (9th Cir. 2018); *see, e.g.*, *id.* at 988 (concluding that there was no Confrontation Clause violation when codefendant's huila (or kite) was admitted because the huila was not testimony).

*Crawford* and *Bruton* only apply if the statement at issue is testimonial for the purpose of establishing or proving some fact.  The California Court of Appeal held that the statement at issue was not admitted for the truth of the matter because it was not admitted to prove that defendants were affiliated with the BGF.  The state court found that the statement was admitted to add corroboration and credibility to the witnesses who also testified about defendants' statements regarding the BGF during the crime.  The California Court of Appeal's holding was not

United States District Court
Northern District of California

1   objectively unreasonable.

2          A review of the record indicates that the statement was only admitted to corroborate the

3   testimony of the witnesses and the statement was not testimonial.  Smith's statement about BGF

4   and threatening the police officer was not in response to any interrogation and was related to

5   Smith's arrest for shoplifting.  The statement and when it was made had no relationship to the

6   underlying crime or Mr. Williams, thus it was properly admitted.  *See Rivas v. Kirkland*, 315 F.

7   App'x 667, 670 (9th Cir. 2009) (spontaneous statements not testimonial).  Nor would the

8   statement have been testimonial with respect to the shoplifting offense.  The statement was not

9   made as a result from questioning to be used in a criminal prosecution.  The police officer testified

10  that he was not questioning Mr. Williams when he suddenly made the statement.  5RT at 881.

11  Thus, the statement was not testimonial.  *See Davis*, 547 U.S. at 822; *see also Melendez-Diaz*, 557

12  U.S. at 310-11.

13         The Confrontation Clause does not bar the use of statements for purposes other than

14  establishing the truth of the matter asserted.  *Crawford*, 541 U.S. at 59 n.9; *see Moses v. Payne*,

15  555 F.3d 742, 761 (9th Cir. 2009) (finding state court properly admitted son's out-of-court

16  statement to social worker that his father had kicked his mother; statement was introduced to show

17  why social worker contacted Child Protective Services, not to prove defendant had kicked the

18  victim).  Because the statement was not admitted to establish that either defendant was part of a

19  gang, but only to corroborate other witness statements, the state court's ruling was not

20  unreasonable.

21         Nor is Mr. Williams entitled to relief pursuant to *Bruton*.  *Bruton* only applies to

22  testimonial statements, as the Ninth Circuit recently held in *Lucero*, 902 F.3d at 987-88.  "[T]he

23  *Bruton* limitation on the introduction of codefendants' out-of-court statements is necessarily

24  subject to *Crawford's* holding that the Confrontation Clause is concerned only with testimonial

25  out-of-court statements."  *Lucero*, 902 F.3d at 987-88.  Because Smith's statement to the police

26  officer was nontestimonial, *Bruton* does not apply.  *See also Mason v. Yarborough*, 447 F.3d 693,

27  696 (9th Cir. 2006) (state court reasonably found no *Bruton* error where statement implicated

28  defendant only when linked to other properly admitted evidence.)

United States District Court
Northern District of California

26

1    Even assuming arguendo that the trial court erred in admitting the statement, Mr. Williams

2    is still not entitled to relief.  Mr. William has failed to show that the admission of the statement

3    had an actual and prejudicial effect upon the jury.  *See Hernandez*, 282 F.3d at 1144 (9th Cir.

4    2002) (citing *Brecht* at 637).  The statement was only one small piece of evidence considering the

5    testimony of the witnesses and Mr. Williams' own testimony about the actual crime.  Even the

6    prosecutor noted that the statement was only a minor part of the case.  *Williams*, 2012 WL

7    4479011 at *13.  The California Court of Appeal's rejection of this claim was not unreasonable.

8    Mr. Williams is not entitled to the writ on this claim.

9    D.    Sufficiency of the Evidence

10   Mr. Williams also argues that there was insufficient evidence to support the prosecution's

11   robbery felony-murder theory.  Petition at 5, 8.  He contends that there was no connection between

12   the robbery and the murder to support felony-murder.  *Id*. at 8.

13   1.    Background

14   The California Court of Appeal set forth relevant background for this claim.  The court

15   stated:

16   Defendants contend the prosecution's robbery felony-murder theory
     is unsupported by the evidence.  When sufficiency of the evidence is
17   challenged, we must "review the whole record in the light most
     favorable to the judgment below to determine whether it discloses
18   substantial evidence-that is, evidence which is reasonable, credible,
     and of solid value-such that a reasonable trier of fact could find the
19   defendant guilty beyond a reasonable doubt."  (*People v. Johnson*
     (1980) 26 Cal. 3d 557, 578.)
20
     "[T]he felony-murder rule requires both a causal relationship and a
21   temporal relationship between the underlying felony and the act
     resulting in death.  The causal relationship is established by proof of
22   a logical nexus, beyond mere coincidence of time and place,
     between the homicidal act and the underlying felony. . . .  The
23   temporal relationship is established by proof the felony and the
     homicidal act were parts of one continuous transaction." (*People v.
24   Cavitt* (2004) 33 Cal. 4th 187, 193.)  Defendants argue there was no
     logical nexus between the robbery and Vincent's murder, and that
25   those crimes were not part of one continuous transaction.

26   The jury was instructed that, "[i]n deciding whether the act causing
     the death and the felony were part of one continuous transaction," it
27   could "consider the following factors: 1. [Whether] the felony and
     the fatal act occurred at the same place; 2. The time period, if any,
28   between the felony and the fatal act; 3. Whether the fatal act was

United States District Court
Northern District of California

committed for the purpose of aiding and abetting the commission of the felony or escape after the felony; 4. Whether the fatal act occurred after the felony but while one or more of the perpetrators continued to exercise control over the person who was the target of the felony; 5. Whether the fatal act occurred while the perpetrators were fleeing from the scene of the felony or otherwise trying to prevent the discovery or reporting of the crime; 6. Whether the felony was the direct cause of death; and 7. Whether the death was the natural and probable consequence of the felony." (CALCRIM No. 549.)

*Williams*, 2012 WL 4479011 at *7-8 (footnote omitted).

The California Court of Appeal rejected Mr. Williams' claim. The court stated:

Defendants admit that the crimes took place in the same location and while the perpetrators exercised control over the victim. Thus, the first and fourth factors are satisfied. While they argue none of the others apply, the attorney general argues that the interval between the robbery and the murder supports the felony-murder verdict, and that the murder was the natural and probable consequence of the robbery. Thus, the parties dispute whether the evidence satisfied the second and seventh factors.

As for the second factor, Ana, Wanda, and Zeke testified that Vincent was stabbed within, at most, 12 to 15 minutes after defendants woke them up. They all testified that the stabbing might have occurred as soon as 10 minutes after they were awakened, and the robbery did not occur immediately upon the initial confrontation. Ana testified that Smith first threatened her with the sword and asked Williams if he wanted him to stab her. Then, according to Wanda's testimony, she woke up when Ana was screaming that she or Vincent was going to be killed. According to Ana, defendants demanded money. Zeke testified that the amount they demanded kept increasing, and he then gave Smith the $10. Since the evidence showed that less than ten minutes elapsed between the robbery and the murder, the jury could reasonably find that the second factor favored the prosecution.

Accordingly, at least three of the seven relevant factors supported a finding of a continuous transaction. Moreover, the stabbing occurred when, as a matter of law, the robbery was ongoing because defendants had not left the scene. (*People v. Cooper* (1991) 53 Cal. 3d 1158, 1166 [for purposes of felony murder, robbery continues through escape to place of temporary safety].) Under all of the circumstances, whether the robbery and murder were parts of a continuous transaction was for the jury to decide on the evidence.

The jury also had substantial evidence from which to find that the robbery and murder were logically connected. Defendants submit that the robbery and the stabbing were entirely unrelated because, after Zeke gave Smith $10, talk turned to Vincent's alleged relationship with Williams' wife and the alleged B.G.F. contract. However, that conversation was not wholly divorced from money. Wanda testified that Williams accused Vincent of "stopp[ing] his money" while he was in jail when Vincent was involved with his

wife.  Williams testified that, when he was talking to Vincent about his wife, he accused Vincent of taking his money and his car, and told Vincent, "Give me my money."

Viewing the evidence in the light most favorable to the judgments, we agree with respondent that "the jury could believe that . . . the intent to rob may have continued past the moment Smith stabbed Vincent."  Ana testified that defendants demanded money of her, Vincent, and Zeke.  After Zeke gave them $10, Smith pointed his sword at her and Vincent.  Although Ana had money in her shoe, Vincent indicated that she should not reach for it.  Williams then began harassing Vincent.  As the attorney general argues, defendants "may well have sensed that Vincent was holding back.  Not only had Vincent nudged Ana, he likely had everything he owned in the world at arm's length.  Williams and Smith realized that it took money to eat and survive (not to mention sustain a drug habit). . . ."  It was reasonable to infer that "Williams' entire purpose [in harassing Vincent] was to upset [him] and get him to hand over money."  It was also "reasonable to infer that Williams slapped Vincent, and Smith stabbed Vincent because they were both frustrated that Vincent . . . would not reward their efforts with at least a token payment.  Thus the entire encounter is easily viewed as an ongoing robbery. . . ."  "Indeed, Vincent's dire reaction to the stabbing may have been the main reason the appellants gave up trying to rob him." The murder and robbery could thus be logically connected.

*Williams*, 2012 WL 4479011 at *8.

As the last reasoned decision from a state court, the California Court of Appeal's decision is the decision to which § 2254(d) is applied.  *See Wilson*, 138 S. Ct. at 1192.  Mr. Williams is entitled to habeas relief only if the California Court of Appeal's decision was contrary to, or an unreasonable application of, clearly established federal law from the U.S. Supreme Court, or was based on an unreasonable determination of the facts in light of the evidence presented.

2.     Analysis

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  A court reviewing a conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt, but rather determines whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt may a court conclude that the

evidence is insufficient.  *See Jackson*, 443 U.S. at 324.  The "prosecution need not affirmatively 'rule out every hypothesis except that of guilt,'" and the reviewing federal court "'faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'"  *Wright v. West*, 505 U.S. 277, 296-97 (1992) (quoting *Jackson*, 443 U.S. at 326).

"*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'"  *Coleman v. Johnson*, 566 U.S. 650, 655 (2012) (per curiam) (quoting *Jackson*, 443 U.S. at 319).  "[O]n habeas review, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge" unless "the state court decision was objectively unreasonable."  *Id.* at 651 (internal quotation marks omitted).

Here, it was not an unreasonable application of, or contrary to, any Supreme Court holding for the California Court of Appeal to conclude that the evidence was sufficient to support the jury's finding that the robbery and murder were part of one continuous transaction.  It was entirely consistent with *Jackson* for the California Court of Appeal to determine that it was for the jury, not the reviewing court, to determine whether the witness' account of the incident was credible.  Under *Jackson*, a jury's credibility determinations are "entitled to near-total deference."  *Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004) (rejecting challenge to the sufficiency of the evidence where defendant argued that victim's "account of being molested on a bed along-side four other sleeping children is inherently implausible").  Although the witness' accounts had some minor discrepancies, they were consistent regarding the robbery and murder.  This Court, like the state appellate court, must defer to the jury's implicit determination that the witnesses were credible.

While Mr. Williams argues that there was no connection between the robbery and murder, it is undisputed that the robbery and murder took place at the same location and Mr. Williams and Smith exercised control over the victim for the duration.  The California Court of Appeal noted that the evidence demonstrated that less than ten minutes elapsed between the robbery and murder and that a jury could reasonably find there was a casual and temporal relationship between the two

events and that they were connected. *Williams*, 2012 WL 4479011 at *8. This finding was not objectively unreasonable

The California Court of Appeal described the relevant state law for felony-murder and analyzed how there was sufficient evidence to find Mr. Williams guilty. To the extent Mr. Williams argues that the state court was incorrect in its analysis of state law and the felony murder rule, he is not entitled to habeas relief. The *Jackson* standard must be applied with reference to the substantive elements of the criminal offense as defined by state law. *Jackson*, 443 U.S. at 324 n.16; *see*, *e.g.*, *Boyer v. Belleque*, 659 F.3d 957, 968 (9th Cir. 2011) (concluding it was not unreasonable, in light of Oregon case law, for Oregon court to conclude that a rational jury could find beyond a reasonable doubt that petitioner intended to kill his victim based on proof that he anally penetrated several victims with knowledge that he could infect them with AIDS). The state court's ruling on the state law issue is binding on this Court.

Mr. Williams has not shown that the state court was objectively unreasonable in finding sufficient evidence to support the conviction in light of the high bar for *Jackson* claims. This Court has reviewed the evidence and agrees with the reasoning of the state court. As noted above there was an abundance of evidence for the jury to find the robbery and murder were part of one continuous transaction. After the victim was robbed, Mr. Williams and Smith remained at the location with their weapons, talking about how the victim had stopped Mr. Williams' money when he was in jail. *Williams*, 2012 WL 4479011 at *8. Mr. Williams then accused the victim of taking his money and car. *Id.* Viewing the evidence in a light most favorable to the prosecution, there was sufficient evidence for the jury to find the essential elements of the crime beyond a reasonable doubt.

To grant relief, this Court would have to conclude that "the state court's determination that a rational jury could have found that there was sufficient evidence of guilt, i.e., that each required element was proven beyond a reasonable doubt, was objectively unreasonable." *Boyer v. Belleque*, 659 F.3d 957, 964-65 (9th Cir. 2011). That conclusion cannot be made here. Mr. Williams fails to show that the California Court of Appeal's rejection of his claim was contrary to, or an unreasonable application of, *Jackson*. He is not entitled to the writ on his claim.

United States District Court
Northern District of California

3.      <u>No Certificate of Appealability</u>

A certificate of appealability will not issue because reasonable jurists "would not find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Accordingly, a certificate of appealability is denied.

**VI.      <u>CONCLUSION</u>**

For the foregoing reasons, the petition for writ of habeas corpus is **DENIED**.  The Clerk shall enter Judgment and close the file.

**IT IS SO ORDERED**.

Dated: December 2, 2020

_____
EDWARD M. CHEN
United States District Judge